Dan DESTACHE, Relator,

v.

INDEPENDENT SCHOOL DISTRICT
NO. 832, Respondent.

No. C3–88–1614.

Court of Appeals of Minnesota.

Jan. 10, 1989.

Eric R. Miller, Oppenheimer Wolff & Donnelly, St. Paul, for relator.

Gloria B. Olsen, Paul W. Hetland, Knutson, Flynn, Hetland & Deans, St. Paul, for respondent.

Independent School Dist. No. 832, Mahtomedi, pro se.

Heard, considered, and decided by WOZNIAK, C.J., and PARKER and SHORT, JJ.

## OPINION

WOZNIAK, Chief Judge.

Daniel Destache, a continuing contract teacher, was placed on an unrequested leave of absence by Independent School District No. 832. On appeal, Destache argues that the district had a duty to realign teaching positions and that reasonable realignment options were available. We disagree and affirm.

## FACTS

Daniel Destache was a continuing contract industrial arts teacher employed by Independent School District No. 832. Due to declining enrollment and financial limitations, the school board decided to reduce positions and programs. Based on the recommendations of school administrators, the school board proposed to discontinue 0.57 FTE (full-time equivalency) of Destache's industrial arts position and to place him on an unrequested leave of absence.

Destache requested a hearing concerning his placement on an unrequested leave of absence, arguing that the district had a duty to realign teaching positions and that reasonable realignments were available. At the hearing, the negotiators of the unrequested leave of absence provision of the teachers' collective bargaining agreement testified concerning whether the plan eliminated any duty to realign. In addition, the hearing officer heard testimony concerning the reasonableness of five different realignment options.

The hearing officer concluded that the district had no duty to realign under the unrequested leave of absence plan and that none of the proposed realignment options was reasonable. The school board adopted these conclusions. Destache appealed the school board's decision to this court by petition for a writ of certiorari.

## ISSUES

1. May an unrequested leave of absence plan negotiated between a school board and teachers eliminate the duty to realign teaching positions?

2. Did the unrequested leave of absence plan here eliminate the duty to realign teaching positions?

3. Were the proposed realignment options practical and reasonable?

## ANALYSIS

■ A school board acts in its administrative capacity when it places a teacher on an unrequested leave of absence. *Beste v. Independent School District No. 697*, 398 N.W.2d 58, 60 (Minn.Ct.App.1986). "The nature of judicial review in a certiorari proceeding under Minn.Stat. § 125.12 is limited." *Peck v. Independent School District No. 16*, 348 N.W.2d 100, 101 (Minn.Ct. App.1984). A board's decision to place a teacher on an unrequested leave of absence may be set aside only if the decision is fraudulent, arbitrary, unreasonable, unsupported by substantial evidence, not within the school board's jurisdiction, or based on an erroneous theory of law. *In re Meyer*, 381 N.W.2d 476, 479 (Minn.Ct.App.1986), *pet. for rev. denied* (Minn. Apr. 18, 1986) (citations omitted). Substantial evidence is "evidence upon which reasonable minds can rely in arriving at a conclusion." *Fisher v. Independent School District No. 622*, 357 N.W.2d 152, 155 (Minn.Ct.App.1984). To determine whether substantial evidence is present, a court must examine the record as a whole. *Id.*

■ 1. A school board and a teachers' bargaining representative have the option of negotiating an unrequested leave of absence plan under Minn.Stat. § 125.12, subd. 6a (1986). If no such plan is negotiated, the statutory provisions of Minn.Stat. § 125.12, subd. 6b (1986) apply. Minn.Stat. § 125.12, subd. 6a (1986). The school board and the teachers' bargaining repre-

sentative here negotiated an unrequested leave of absence plan under section 125.12, subd. 6a.

Minnesota courts have found a duty to realign in unrequested leave of absence plans. The supreme court has held that reasonable realignment is required in a Minn.Stat. § 125.17 school. *Strand v. Special School District No. 1,* 392 N.W.2d 881, 886 (Minn.1986). This court extended the duty to realign to districts covered by section 125.12 in *Westgard v. Independent School District No. 745,* 400 N.W.2d 341 (Minn.Ct.App.1987), *pet. for rev. denied* (Minn. Apr. 17, 1987). In *Westgard,* where an unrequested leave of absence plan had been negotiated under section 125.12, subd. 6a, this court held that a duty to realign existed. *Id.* at 345. Because a section 125.12, subd. 6a plan was similarly negotiated in this case, a duty to realign exists here as well.

This court has recognized, however, that the scope of the duty to realign may be limited in a negotiated unrequested leave of absence plan. *In re Nelson,* 416 N.W.2d 848, 850 (Minn.Ct.App.1987), *pet. for rev. denied* (Minn. Mar. 18, 1988). In *Nelson,* the plan required that any realigned teacher be "qualified." "Qualified" was defined as being licensed and having a major in the subject area. *Id.* This definition was narrower than the mere licensure required for realignment in *Strand.* A majority of this court refused to order realignment because:

> [e]ven if realignment were attempted, Nelson would still have been placed on unrequested leave of absence because the senior teachers proposed for realignment are not "qualified" within the meaning of the agreement for the proposed areas of assignment.

*Id.* In reaching this conclusion, the court emphasized the importance of encouraging unique approaches to the collective bargaining process between school districts and teachers. *Id.* at 851.

We conclude that *Nelson* should be extended to allow parties to eliminate their duty to realign teaching positions through a negotiated leave of absence plan. This extension is consistent with the underlying policy in *Nelson* of not attempting to "limit the manner in which teachers and school districts approach negotiations." *Id.* at 851.

■ 2. The hearing officer concluded that Article XV of the collective bargaining agreement removes the duty to realign. Article XV provides in pertinent part:

> This Article has been agreed upon by the School Board and the Association pursuant to the provisions of M.S. 125.12, subd. 6a, and shall constitute a plan for unrequested leave of absence because of discontinuance of position, lack of pupils, financial limitations or merger of classes caused by consolidation of districts. Accordingly, the provisions of M.S. 125.12, subd. 6b shall not be applicable to any teacher employed by the School District.

The school board adopted the hearing officer's conclusion that Article XV eliminates the duty to realign.

We agree with Destache's contention that there is nothing in the express language of Article XV which eliminates the duty to realign. The language in Article XV merely tracks section 125.12, subd. 6. Nevertheless, it has been recognized that:

> In interpreting a collective bargaining agreement it is often necessary to go outside the four corners of the contract itself and examine the agreement history to ascertain the intent of the agreement and determine the rights and duties of the parties.

*International Union v. White Motor Corp.,* 505 F.2d 1193, 1197 (8th Cir.1974), *cert. denied,* 421 U.S. 921, 95 S.Ct. 1588, 43 L.Ed.2d 789 (1975); *see also Tchida v. Police Officers' Federation,* 375 N.W.2d 856, 860 n. 2 (Minn.Ct.App.1985), *pet. for rev. denied* (Minn. Dec. 30, 1985). Thus, we may examine the agreement history here to determine if the parties intended to eliminate the duty to realign teaching positions.

Both parties presented testimony to the hearing officer concerning the meaning of Article XV. During the collective bargaining agreement negotiations, John Maas represented the school board and Daniel

Nuese represented the teachers. Donald Lifto, the superintendent of schools for the district, was present at several negotiating sessions. Both Maas and Lifto testified that the district understood Article XV eliminated the duty to realign and that Nuese confirmed this interpretation during the 1987–89 negotiations. In addition, Nuese testified that:

> When we got into the discussion of 6a and 6b, and my comment was that the district maintains the right of assignment, and that *Strand* does not affect this contract. They are not required to reassign more senior teachers.

Nuese also testified that the district would not be required to realign a long-time physical education teacher to a science class. Nuese, however, testified that he objected to this example because it was a smoke screen to scare the school board and because "there were realignments other than that possible."

Although we recognize that there is conflicting evidence regarding the meaning of Article XV, we can only overturn the school board's conclusion if it is not supported by substantial evidence. Since the record as a whole contains evidence upon which a reasonable mind could rely in concluding that the parties intended to preclude realignment through Article XV, the school board's decision here was supported by substantial evidence.

■ 3. Nevertheless, if realignment were legally required here, we choose to address this issue and emphasize that the realignment must be practical and reasonable. *Brandhorst v. Special School District No. 1*, 392 N.W.2d 888, 889 (Minn. 1986). To determine if a realignment option is practical and reasonable, the court should consider:

> the teacher's length of service, the duration and scope of the teacher's license, the school district's needs reflecting the welfare of the students and the public, and the ease of reassignment or realignment of course schedules to facilitate a retention of the most senior teachers.

*Strand*, 392 N.W.2d at 885. Five realignment options were presented to the hearing

officer. He concluded that none of these options was reasonable and practical. The school board adopted this conclusion.

■ Destache proposed one realignment option, which was set forth in Association Exhibit No. 1. Prior to realignment, Destache was to teach sixth, seventh, and eighth period industrial arts courses. Under Destache's proposal, he would receive first and second period industrial arts courses from Koscianski. Koscianski, in turn, would receive first and second period industrial arts courses from Meslow. Meslow would then receive first and second period counseling periods from a probationary first-year teacher.

Destache contends that this proposal is reasonable. He emphasizes that each of the reassignments is within the high school building and that there are no schedule conflicts. In addition, Destache stresses that under this option, no continuing contract teacher will experience any reduction in employment. Finally, all of the teachers are licensed in the realigned subjects and have taught them recently.

The school board argues that this option is unreasonable because it would require Meslow, the athletic director, to perform part-time counseling duties. Principal Whippler testified that the school had tried having the athletic director perform counseling duties before, but the unpredictable and demanding nature of the athletic director's tasks led to neglect of counseling duties. Whippler also testified that this realignment option would divide counselor duties among three people rather than between two people, possibly leading to a loss of continuity with students. Finally, the school board argues that this realignment option limits its discretion in scheduling because it requires juggling individual supervisory class periods to fill out a teacher's schedule in advance of a final schedule.

Although we may have reached a different conclusion, the testimony given at the hearing is evidence on which a reasonable mind could rely in concluding that this realignment option was not in the best interests of the students. Moreover, this option involves realigning only two class periods to Destache. Requiring realignment of in-

dividual class periods was rejected in *Strand* because it deprived school districts of "sufficient flexibility to effectively administer the schools." 392 N.W.2d at 885 (*citing Laird v. Independent School District No. 317*, 346 N.W.2d 153, 155 (Minn. 1984)). The realignment proposed here raises similar concerns. In these circumstances, there was substantial evidence for finding this realignment option unreasonable.

■ There was substantial evidence to support the conclusion that the four realignment options considered by the school board were not reasonable. The School District Exhibit No. 2 realignment plan resulted in travel between schools with different class period times and no female supervision of the girls' locker room. The School District Exhibit No. 3 realignment option led to travel between schools with different class period times and to difficulties in retaining a mathematics teacher to teach a truncated class schedule. The consequences of these two plans indicate that such a realignment would not be easy and might harm the welfare of the students. Therefore, there was substantial evidence that these options were not reasonable. Also, both School District Exhibits No. 4 and 5 involved assigning a teacher to teach a subject that the teacher had not taught in over 20 years. Because a reasonable mind could rely on this considerable length of time in concluding that the reassignments might harm the welfare of the students, there was substantial evidence for concluding that the realignment options in exhibits no. 4 and 5 were not reasonable.

### DECISION

There was substantial evidence to support the school board's conclusion that the duty to realign teaching positions was eliminated through a negotiated leave of absence plan. Thus, the school board did not err in refusing to realign teaching positions to accommodate Destache.

AFFIRMED.